UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SHIN CREST PTE, LTD, ET AL.,

    Plaintiffs,

v.    Case No. 8:07-cv-1433-T-24 MAP

AIU INSURANCE COMPANY,

    Defendant.
_____/

### **ORDER**

This cause comes before the Court on Defendant's Motion for Summary Judgment. (Doc. No. 72). Plaintiffs oppose the motion. (Doc. No. 80).

### **I. Standard of Review**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must draw all inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor. See Porter v. Ray, 461 F.3d 1315, 1320 (11th Cir. 2006)(citation omitted). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. See id. (citation omitted). When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. See id. (citation omitted).

## II. Background

Shin Crest[1] is a foreign company that manufactures and/or distributes outdoor folding chairs. Shin Crest sold its chairs in the United States through retail outlets, including Sam's Club. For the time period of December 1, 2000 through December 1, 2001, Shin Crest was insured by Defendant AIU Insurance Company ("AIU") under a $2 million general liability insurance policy. Sam's Club was named as an additional insured under the policy.

On April 21, 2001, Doreen Blair was visiting a relative and suffered a tragic accident. Specifically, she was sitting on a dock in a chair manufactured and/or distributed by Shin Crest and sold by Sam's Club and fell into a dry lake-bed. Mrs. Blair was rendered a paraplegic as a result of the fall.

Thereafter, in 2003, Mrs. Blair and her husband filed suit against Sam's Club ("Blair I suit"), in which they claimed that the chair was defective and caused the fall. Shin Crest was not a defendant in the Blair I suit. Attorney Frank Winkles represented the Blairs in that lawsuit.

Sam's Club tendered the lawsuit to AIU for defense and indemnity. James Clark was assigned to the case to assist with the investigation, defense, and adjusting of the claim in the Blair I suit. James Gannon was also assigned to oversee the claim. Additionally, AIU assigned James Dolan and William McFarlane to defend Sam's Club in the lawsuit.

Dolan and McFarlane hired Clyde Richard, as an expert, and after an investigation, Richard found and reported that there was no defect in the chair. Specifically, he found that the chair was properly designed and constructed and that the chair was safe for its intended use. (Doc. No. 72, Ex. 6, Richard reports dated 8/19/04 and 12/16/04). Additionally, Richard found

---

[1]Plaintiffs are collectively referred to as "Shin Crest."

that the accident occurred because: (1) "Mrs. Blair sat in a chair that had its rear legs so close to the edge of the boat dock that the rear legs of the chair were able to move off of the dock," and (2) "Ms. Blair did not provide for her own safety." (Doc. No. 72, Ex. 6, Richard reports dated 8/19/04 and 12/16/04). As a result, McFarlane and Dolan believed that Sam's Club was not liable for the accident. (Doc. No. 73, McFarlane depo, p. 34-35). Additionally, Shin Crest told AIU that they had not received any other claims regarding the same model chair and that Shin Crest believed that the chair was not defective. (Doc. No. 73, Ruey depo, p.36-37; Doc. No. 72, Ex. 7).

In support of their claim that the chair was defective, the Blairs hired experts to examine the chair. One of their experts, Robert Anderson, opined that the chair was defective and could have been remedied by putting a spreader bar on the legs of the chair. (Doc. No. 72, Ex. 8). However, Sam's Club's expert, Richard, disagreed with Anderson's opinion, stating that a spreader would pose the threat of seriously injuring the fingers of anyone who accidently had their fingers in the wrong place while attempting to fold the chair. (Doc. No. 72, Ex. 6, Richard reports dated 8/19/04 and 12/16/04).

The Blairs also hired another expert, Richard McClay, who basically agreed with Anderson's opinion regarding the necessity of adding a spreader to the chair. (Doc. No. 72, Ex. 6, Richard reports dated 8/19/04). McFarlane found McClay's opinion unpersuasive, since McClay did not have prior experience with folding chairs. (Doc. No. 73, McFarlane depo, p.48). Thus, after considering the opinions of both Anderson and McClay, McFarlane still believed that there was no evidence of liability. (Doc. No. 73, McFarlane depo, p.49).

The court in the Blair I suit ordered the Blairs and Sam's Club to mediate the case, and

the court requested that Shin Crest attend the mediation even though it was not a defendant in the case. (Doc. No. 72, Ex. 9). Shin Crest agreed to attend the mediation, and it sent Betty Ruey as its representative. Shin Crest believed that AIU was protecting its interest, but AIU did not provide separate counsel for Shin Crest. (Doc. No. 73: Ruey depo, p. 148-50).

Prior to the mediation, McFarlane and Dolan assessed the case as follows (Doc. No. 72, Ex. 10): They did not think that there was any liability on the part of Sam's Club, but felt that if the jury liked Mrs. Blair, the jury might find liability in her favor. As a result, they estimated that the jury could find Mrs. Blair at least 80% at fault (not 100% due to juror sympathy), because the chair was placed too close to the edge of the dock. They believed that the chair did not break or malfunction, and they intended to file a <u>Daubert</u> motion to exclude Mrs. Blair's experts. They estimated that if Mrs. Blair received a verdict in her favor, damages would likely total between $4 and $8 million before a reduction for her own negligence. As a result, they placed a settlement value on the case of $1 to $1.5 million.

Similarly, Clark placed a settlement value on the case of $1 million. (Doc. No. 72, Ex. 11). Clark believed that $1 million–a seven figure settlement amount–would be hard for Mrs. Blair to walk away from, especially since AIU, defense counsel, and Shin Crest believed that there was no defect in the chair. (Doc. No. 73: Gannon depo, p. 141-42; Dolan depo, p. 61). Clark attended the mediation with settlement authority of $1 million, and if his evaluation of the value of the case changed during the mediation, he could contact Gannon and request authorization for a higher settlement amount. (Doc. No. 72, Ex. 11).

Shin Crest's position was always that the chair did not have a defect, and as a result, it did not understand why it should pay anything if the chair was not defective. (Doc. No. 72, Ex.

4

12). However, Shin Crest agreed with McFarlane and Dolan's approach for settlement within the policy limits. (Doc. No. 72, Ex. 12). At no time did Shin Crest offer to contribute money in order to settle the case. (Doc. No. 72, Ex. 12; Doc. No. 73: McFarlane depo, 102-03). However, Shin Crest now maintains that if AIU had told it that Shin Crest needed to contribute money in order to achieve a complete settlement of the claims against Sam's Club and Shin Crest, Shin Crest would have done so. (Doc. No. 73: Ruey depo, p. 148-49).

Prior to the mediation, Mrs. Blair made a settlement demand of $20 million. (Doc. No. 72, Ex. 13). Additionally, Winkles (Mrs. Blair's attorney) conveyed the position that he was going to try to get as much as he could from Sam's Club and then go up the line and sue everyone else, including Shin Crest. (Doc. No. 72, Ex. 13). Prior to the mediation, Winkles never indicated that there was a possibility of settlement of the claims against both Sam's Club and Shin Crest for the policy limits. (Doc. No. 72, Ex. 13).

The mediation took place on January 13, 2005. AIU brought a structured settlement annuitant to the mediation in order to offer benefits through a structured settlement. (Doc. No. 72, Ex. 13).

At the mediation, Winkles made a settlement demand of $20 million. In response, AIU countered with a structured settlement of $250,000 up front, plus $2,000 a month for the rest of Mrs. Blair's life. (Doc. No. 72, Ex. 14). Winkles reduced his demand to $19 million, and AIU increased its offer to $250,000 up front, plus $2,500 a month for the rest of Mrs. Blair's life (a settlement offer that had a value of approximately $625,000). (Doc. No. 72, Ex. 14). At some point, Winkles discussed a possibility of reducing his demand to $5 to $6 million. (Doc. No. 72, Ex. 14). Eventually, AIU decided not to continue mediation negotiations, and an impasse was

declared. (Doc. No. 73: Gannon depo, p. 171).

At no point during the mediation did AIU offer a settlement valued at $1 million (which was the settlement value that was placed on the claim prior to mediation and the amount that AIU thought would be high enough to tempt Mrs. Blair and limit the claim exposure). (Doc. No. 72, Ex. 14; Doc. No. 73: Dolan depo, p. 61). At no point during the mediation did Winkles communicate a willingness to settle the claims against both Sam's Club and Shin Crest for the policy limits. (Doc. No. 72, Ex. 14).

Shin Crest maintains that had the policy limits been offered to settle the claims against both Sam's Club and Shin Crest at the mediation, the Blairs would have accepted the offer. (Doc. No. 73: Mrs. Blair's depo, p. 30; Doc. No. 73: Mr. Blair's depo, p. 39). Furthermore, Shin Crest points out that the Blairs were in desperate financial straights and faced foreclosure of their home. (Doc. No. 73: Clark depo, p. 161-62). At the time of the mediation, AIU was aware of the threat of foreclosure that the Blairs were facing. (Doc. No. 73: Clark depo, p. 161-62).

Despite the impasse at mediation, negotiations continued. On January 18, 2005, Winkles offered to settle the claim against Sam's Club for $4 million. (Doc. No. 72, Ex. 16). Dolan responded that AIU was only willing to pay $1 million, and that was contingent on a global release. (Doc. No. 72, Ex. 16). Thereafter, on January 21, 2004, Winkles offered to settle the claim against Sam's Club for $2 million, but he specifically stated that the Blairs would not sign a release of their claim against Shin Crest. (Doc. No. 72, Ex. 17). When considering this settlement offer, AIU considered the ramifications of not accepting it. (Doc. No. 80, Ex. F). Specifically, AIU noted that if it did not accept the offer and the case went to trial and the Blairs were awarded more than the policy limit, AIU could be exposed to paying the entire amount of

6

the judgment. (Doc. No. 80, Ex. F). On February 8, 2005, in response to Winkles $2 million settlement offer, McFarlane responded that the insurance policy was an eroding policy (the $2 million was being reduced by the cost of other claims and AIU's defense for Sam's Club) with less than $1.8 million left, and he reiterated his offer to settle for $1 million. (Doc. No. 72, Ex. 17).

On February 11, 2005, Winkles offered to settle the claim against Sam's Club for the remaining policy limits (which was approximately $1.8 million), but again he stated that Shin Crest would not be released. (Doc. No. 72, Ex. 18). McFarlane contacted AIU with this offer and recommended accepting it because the outcome at trial was unpredictable. (Doc. No. 72, Ex. 18). AIU responded to McFarlane and Dolan by questioning why this amount was appropriate, especially since it was for more than the settlement value of the case that was estimated prior to the mediation and there had been no new facts discovered that would justify a re-evaluation of the value of the case. (Doc. No. 72, Ex. 18). However, Clark noted that there might be legal authority providing that if there is a demand for the policy limits, and the demand is not accepted and the claimant gets a judgment for more than the policy limits, the insurance company could be liable for the entire amount of the judgment, despite the fact that the judgment exceeded the policy limits. (Doc. No. 72, Ex. 18).

McFarlane responded that despite his belief that the case was defensible, Mrs. Blair's current demand for settlement of the remaining policy limits was not significantly different than the high-end of AIU's settlement value of the case, which was $1.5 million. (Doc. No. 72, Ex. 19). Specifically, he stated:

> [AIU] must act in the best interest of its insured and secure a Release. Given the magnitude of the injuries suffered by the Plaintiff and the risk of a verdict in

7

> excess of the available insurance policy limits, I do not feel that the risk of a verdict in excess of the insurance policy limits and the exposure to the insured can be justified given that the Plaintiffs' demand is approximately $293,296.21 different than our evaluation. Although $293,296.21 is a significant amount of money, it is not significant in terms of the exposure to the insured and the potential verdict which could occur.

(Doc. No. 72, Ex. 19: 2/15/05 letter).

On February 18, 2005, McFarlane again asked Winkles whether he would consider a global settlement for the policy limits that would include Shin Crest, but Winkles was adamant that he would not. (Doc. No. 72, Ex. 19). Additionally, Sam's Club made a demand that the claim be settled for the remaining policy limits. (Doc. No. 72, Ex. 20). Thereafter, McFarlane again recommended to AIU that it should tender the policy limits in order to obtain a settlement as to the claim against Sam's Club. (Doc. No. 72, Ex. 20). AIU ultimately determined that it should settle the case on behalf of Sam's Club only, because that was the only settlement that it could get. (Doc. No. 72, Ex. 18).

On February 21, 2005, AIU informed Shin Crest of the settlement offer for the remaining policy limits and of AIU's intention of accepting it in order to settle the claim against Sam's Club. (Doc. No. 63: Ruey depo, p. 124-25; Doc. No. 72, Ex. 20). Shin Crest objected to the settlement, but AIU told Shin Crest that it was too late, as AIU had already accepted the offer to settle. (Doc. No. 63: Ruey depo, p. 123-25). Additionally, AIU told Shin Crest that if AIU had not accepted the settlement offer, AIU could be required to pay the entire amount of any judgment that the Blairs received if they won at trial. (Doc. No. 73: Ruey depo, p. 146, 148). However, at the time that AIU accepted the settlement offer, AIU knew that even though a suit had not yet been filed against Shin Crest for Mrs. Blair's injuries, the statute of limitations did not expire on such a claim until April 22, 2005. (Doc. No. 72, Ex. 16: 1/19/05 email).

8

On March 22, 2005, the Blairs filed suit against Shin Crest ("Blair II suit"). Because the policy limits had been exhausted by the settlement of the Blair I suit, AIU would not defend Shin Crest in the Blair II suit.

On February 28, 2007, Winkles offered to settle the claim against Shin Crest in the Blair II suit for $2 million. (Doc. No. 72, Ex. 21). Shin Crest did not accept the offer. (Doc. No. 72, Ex. 21). However, in October of 2007, Shin Crest and the Blairs entered into a stipulated judgment for $12 million, in which the Blairs agreed to not attempt to collect the judgment from Shin Crest as long as Shin Crest pursued a bad faith claim against AIU, with the Blairs sharing in any damages that were awarded. (Doc. No. 72, Ex. 21). In the stipulated judgment, Shin Crest continued to maintain that it was not liable for Mrs. Blair's injuries. (Doc. No. 72, Ex. 21).

On August 14, 2007, Shin Crest filed the instant case against AIU, in which it alleges that AIU acted in bad faith in handling the Blairs' claim. The crux of the bad faith claim is Shin Crest's contention that AIU should have offered its policy limits at the mediation in exchange for a release of the Blairs' claims against both Sam's Club and Shin Crest, and that by failing to do so, AIU failed to protect both of its insureds. Instead, Shin Crest maintains, AIU's handling of the Blair I suit reveals that AIU was protecting its own interests at the expense of Shin Crest. As a result, Shin Crest seeks $12 million in damages. (Doc. No. 26).

## III. Bad Faith Claims Handling

In <u>Berges v. Infinity Insurance Co.</u>, the Florida Supreme Court explained the purpose of bad faith insurance law:

> Bad faith law was designed to protect insureds who have paid their premiums and who have fulfilled their contractual obligations by cooperating fully with the insurer in the resolution of claims. The insurance contract requires that the insured surrender to the insurance company control over whether the claim is

9

settled. In exchange for this relinquishment of control over settlement and the
conduct of the litigation, the insurer obligates itself to act in good faith in the
investigation, handling, and settling of claims brought against the insured.
Indeed, this is what the insured expects when paying premiums. Bad faith
jurisprudence merely holds insurers accountable for failing to fulfill their
obligations . . . .

896 So. 2d 665, 682-83 (Fla. 2005).

Twenty-five years earlier, the Florida Supreme Court set forth the standard to be applied in bad faith litigation:

> An insurer, in handling the defense of claims against its insured, has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business. For when the insured has surrendered to the insurer all control over the handling of the claim, including all decisions with regard to litigation and settlement, then the insurer must assume a duty to exercise such control and make such decisions in good faith and with due regard for the interests of the insured. This good faith duty obligates the insurer to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same. The insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so.

Boston Old Colony Ins. Co. v. Gutierrez, 386 So. 2d 783, 785 (Fla. 1980)(internal citations omitted). Furthermore, "[a]n insurer cannot escape liability for breach of the duty of good faith by acting upon what it considers to be its interest alone." Id. at 786.

In determining whether an insurer has acted in bad faith in handling a claim, courts apply the totality of the circumstances standard, considering several factors:

> The lack of a formal offer to settle does not preclude a finding of bad faith. Although an offer of settlement was once considered a necessary element of a duty to settle, . . . an offer to settle is not a prerequisite to the imposition of liability for an insurer's bad faith refusal to settle, but is merely one factor to be considered.
> \* \* \*
> Bad faith may be inferred from a delay in settlement negotiations which is willful

10

and without reasonable cause. Where liability is clear, and injuries so serious that a judgment in excess of the policy limits is likely, an insurer has an affirmative duty to initiate settlement negotiations.

Any question about the possible outcome of a settlement effort should be resolved in favor of the insured; the insurer has the burden to show not only that there was no realistic possibility of settlement within policy limits, but also that the insured was without the ability to contribute to whatever settlement figure that the parties could have reached.

* * *

An insurer has a duty to advise the insured of settlement opportunities and the probable outcome of a lawsuit and to warn him of the consequences of an excess judgment so that he might take whatever steps are available for his own protection. Where the insured reasonably relies on the insurer to conduct settlement negotiations, and the insurer fails to disclose settlement overtures to the insured, the jury may find bad faith

Finally, the ultimate tender of the policy limits does not automatically insulate an insurer from liability for bad faith.

Powell v. Prudential Property & Cas. Ins. Co., 584 So. 2d 12, 14-15 (Fla. 3d DCA 1991)(internal citations omitted); see also Berges, 896 So. 2d at 680 (citation omitted). While the issue of whether an insurer acted in bad faith is ordinarily a question for the jury, courts have, in certain circumstances, concluded as a matter of law that the insurance company did not act in bad faith. See Berges, 896 So. 2d at 680.

## IV. Motion for Summary Judgment

Now pending before the Court is AIU's motion for summary judgment, in which it argues, among other things, that it is entitled to summary judgment on Shin Crest's bad faith claim because: (1) AIU did not have an obligation to make a policy limits offer at the mediation; and (2) AIU did not act in bad faith by exhausting the policy limits in order to settle the claim against Sam's Club. Accordingly, the Court will address each argument.

### A. Policy Limits Offer at the Mediation

As one of its bases for its bad faith claim, Shin Crest argues that AIU should have offered to settle the case at the mediation for its policy limits in return for a release of both Sam's Club and Shin Crest. AIU argues that it is entitled to summary judgment on this claim, because it did not have an obligation to make a policy limits offer at the mediation.

AIU acknowledges that Powell stands for the proposition that when liability is clear and injuries are so serious that a judgment in excess of the policy limits is likely, an insurer has an affirmative duty to initiate settlement negotiations. See Powell, 584 So. 2d at 14 (citation omitted). However, AIU points out that the instant case is distinguishable from Powell in that Shin Crest's liability was not clear at the time of the mediation (or ever). Shin Crest denied that the chair was defective, and Richard, the defense expert, opined that the chair was not defective and was not the cause of the accident.

Furthermore, Shin Crest does not allege that settlement negotiations were not initiated or that AIU failed to participate in settlement negotiations; instead, Shin Crest argues that AIU acted in bad faith because it should have offered more money (i.e., the policy limits) when negotiating at the mediation. However, if the Court were to accept this theory, the Court would be expanding the scope of bad faith litigation even farther than it already is, with negative, far-reaching implications.

If this Court were to find that AIU may have acted in bad faith based on the timing of its policy limits offer when the liability for the underlying claim was greatly disputed, the Court would be treading on a very slippery slope. At what point was AIU required to offer the policy limits? If AIU offered it too soon, it would lose all negotiating power, as the Blairs' initial

demand was $20 million. If AIU had offered the policy limits at the mediation and the Blairs had rejected the offer,[2] what would stop Shin Crest from arguing that a policy limits offer should have been made prior to mediation?

The bottom line is, under the facts of this case, liability is greatly disputed, and settlement negotiations entail strategy regarding the amount to offer and when to make such an offer. This is not a situation in which the insurance company made a de minimus offer. AIU's final offer at mediation was valued at $625,000–a very large sum of money given the fact that there is evidence to support the conclusion that the fall was not caused by the chair and Shin Crest firmly took that position.

Shin Crest focuses on the fact that Mrs. Blair's injuries were very serious and potential damages could far exceed the policy limits. While this is certainly a factor an insurance company must consider, this factor is not determinative when liability is not clear. Otherwise, any time a person is seriously injured and makes an insurance claim, the insurance company would be forced to decide between: (1) offering the policy limits in an attempt to settle a possibly completely defensible claim to avoid a bad faith claim, but also exhausting the policy limits available to the insured for any future claims asserted against it later during the policy period (for which the insured could be clearly liable and exposed to a much larger damages award); or (2) not offering the policy limits based on evidence supporting a theory of no liability (a theory that the insured endorses) and face the possibility of a bad faith claim for failing to settle. There is no "right" answer for insurance companies, and as a result, no matter what they

---

[2]The Court is setting out a hypothetical scenario only and makes no finding as to whether there was, in fact, a possibility of settlement at the mediation for the policy limits.

do, they will likely face a bad faith claim for their actions.

In this case, it is clear that AIU considered the very serious nature of Mrs. Blair's injuries and the significant amount of damages that could be awarded. Specifically, AIU valued the claim at $1 to $1.5 million. To require AIU to offer the policy limit at the mediation, which was approximately $1.8 million–despite the fact that liability was not clear, AIU did not value the settlement value of the case that high, and there was evidence to support the theory of no liability–would completely extinguish any control that AIU had over the defense and settlement of the Blairs' claim. Rather, as explained above, AIU would at all times during the underlying litigation have faced the possibility of a bad faith action for not offering the policy limits sooner. Such should not be the appropriate result under the specific facts of this case.

Thus, as explained above, there was no obligation on AIU to offer the policy limits at the mediation in an attempt to settle the claim against both Sam's Club and Shin Crest due to the contested liability, evidence in support of a finding of no liability, and Shin Crest's position that the chair was not defective. Furthermore, since AIU attended the mediation and made substantial offers to settle this case, the Court finds that AIU should not be penalized for following a reasonable and rational strategy when making its settlement offers. Negotiations continued after the mediation, and on February 18, 2005, AIU did offer to tender the remaining policy limits in return for a full release of Sam's Club and Shin Crest. Thus, Shin Crest's bad faith claim rests on the timing of a settlement offer in a case without clear liability, and under the facts of this case, such a claim should not proceed.

Common sense dictates that based on all of the facts and evidence known to AIU at the time of the mediation, AIU's settlement strategy at the mediation cannot be characterized as bad

14

faith handling of the Blairs' claim.[3]  Therefore, this Court finds that as a matter of law, under the specific facts of this case, AIU's failure to offer the policy limits at the mediation did not constitute bad faith handling of the Blairs' claim.

Justice Wells of the Florida Supreme Court identified the problem that exists in bad faith litigation in a thorough and well-reasoned dissenting opinion:

> I recognize that since this Court's decision in [Boston Old Colony], bad faith claims against liability insurers have served a useful role in the regulation of Florida's insurers. I know that there are real incidents of bad faith conduct on the part of insurers in the handling of insurance claims, which are deservedly a basis for bad faith damages. In other words, there is a place for a remedy against insurers that in real situations act in actual bad faith.
>
> On the other hand, I must also recognize that there are strategies which have developed in the pursuit of insurance claims which are employed to create bad faith claims against insurers when, after an objective, advised view of the insurer's claims handling, bad faith did not occur. This is a strategy which consists of setting artificial deadlines for claims payments and the withdrawal of settlement offers when the artificial deadline is not met. The goal of this strategy is to convert a policy purchased by the insured which has low limits of insurance into unlimited insurance coverage.
>
> \*   \*   \*
>
> [Allowing created] bad faith action[s] is . . . greatly detrimental to Florida's liability insurance consumers because of the increases in their insurance costs.
>
> \*   \*   \*
>
> My conclusion is that while bad faith claims based upon substantive wrongful acts by an insurer are a useful part of insurance regulation, such claims must be

---

[3]Shin Crest points out that the Blairs were in dire financial straights and that AIU knew this at the time of the mediation, and as such, AIU should have offered the policy limits at the mediation. Again, Shin Crest is asking for a rule that requires an insurance company to consider some facts (such as the injured party's financial condition and/or the severity of the injuries) to the exclusion of other facts (evidence supporting a conclusion of no-liability). If liability were clear in this case, then the Blairs' financial condition and the severity of Mrs. Blair's injuries would weigh much more heavily in favor of a finding of bad faith. However, many people involved in tragic accidents that suffer very serious injuries are likely to face dire financial situations due to the unforseen event, but this cannot be the decisive factor in a case where liability is not clear.

15

carefully screened by the courts so that only real-rather than created-bad faith claims provide a basis for a bad faith recovery of damages against an insurer.

* * *

I do not believe that it is acceptable for the Court to merely say that bad faith is a jury question. It is the Court's responsibility to have logical, objective standards for bad faith and not to avoid setting definitive standards by declaring bad faith to be a jury question. The Court should recognize that it has the responsibility to reserve bad faith damages, which is limitless, court-created insurance, to egregious circumstances of delay and bad faith acts. The Court likewise has a responsibility to not allow contrived bad faith claims that are the product of sophisticated legal strategies and not the product of actual bad faith.

Berges, 896 So. 2d at 685-86 (citation omitted).

### B. Exhaustion of Policy Limits to Settle Claims Against Sam's Club

Additionally, Shin Crest's bad faith claim is based on AIU exhausting the policy limits in order to settle the claim against Sam's Club, leaving Shin Crest exposed to liability on the Blairs' claim. In response to this argument, AIU cites Contreras v. U.S. Security Ins. Co., 927 So. 2d 16 (Fla. 4th DCA 2006).

In Contreras, a pedestrian was hit and killed by a car driven by Dale that was owned by Dessanti. Dessanti's car was insured by U.S. Security, and Dale was an additional insured under the policy. When the attorney for the estate of the pedestrian, Velasquez, made a demand for the policy limits of $10,000, the insurance company agreed as long as both Dale and Dessanti were released from liability. Velasquez objected and stated that he would only release Dessanti. The insurance company responded that since it had a good faith obligation to both of its insureds, it could not tender the policy limits in order to settle the claims against only one of the insureds. Thereafter, Velasquez filed suit against both Dale and Dessanti, which resulted in an award of damages in excess of $1 million.

After the judgment, a bad faith claim was filed against U.S. Security for failing to settle the claim against Dessanti for the policy limit. The trial court entered a directed verdict in favor of the insurance company, stating that due to its good faith obligation to both insureds, the insurance company could not settle for the policy limits in exchange for a release of only one of the insureds. On appeal, the appellate court reversed, stating:

> Clearly, U.S. Security did have an obligation to act in good faith towards both of the insureds. In an effort to fulfill its obligation of good faith, U.S. Security attempted to secure, in exchange for the policy limits, a release for both Dessanti and Dale. Because of the gravity of Dale's misconduct, [the pedestrian] was not willing to settle the claim against Dale. Having attempted to secure a release for Dale without success, U.S. Security fulfilled its obligation of good faith towards Dale. Once it became clear that [the pedestrian] was unwilling to settle with Dale and give him a complete release, U.S. Security had no further opportunity to give fair consideration to a reasonable settlement offer for Dale. Since U.S. Security could not force [the pedestrian] to settle and release Dale, it did all it could do to avoid excess exposure to Dale. Having fulfilled its obligation to Dale, U.S. Security thereafter was obligated to take the necessary steps before [the pedestrian's] offer expired to protect Dessanti from what was certain to be a judgment far in excess of her policy limits.

Contreras, 927 So. 2d at 21.

Based on Contreras, AIU argues, it had an obligation to settle the claim against Sam's Club once it was clear that it was not possible to also obtain a release of the claim against Shin Crest. The evidence supports the conclusion that at the time AIU accepted the settlement demand, AIU had already attempted to obtain a release for Shin Crest and that there was no reasonable possibility that one could be obtained at that time. As a result, AIU argues, its acceptance of the Blairs' demand to settle the claim against Sam's Club for the policy limit was not an act of bad faith. The Court agrees.

Shin Crest also argues that AIU was only looking out for its own best interests and not

17

that of Shin Crest when it accepted the Blairs' settlement demand. Shin Crest bases this argument on the fact that when AIU believed that it could be liable for an excess judgment if it failed to settle, that is when it chose to settle the case for the policy limits. There are two flaws in this argument. First, AIU chose to settle this case when there was an offer to settle this case at an amount close to the settlement value that it placed on the claim. As previously explained, under the facts of this case, AIU did not have the duty to make a policy limits offer, so its choice not to make such an offer until the Blairs made such a demand is not dispositive. Furthermore, under <u>Contreras</u>, failure to accept the policy limits demand would have been a basis for Sam's Club to assert a bad faith claim against AIU.

Second, given the surge of bad faith litigation, of course, every insurer considers the possibility of liability for an excess judgment when faced with a claim against its policy. Furthermore, such a consideration must be expected, given that the purpose of bad faith law is to deter insurance companies from failing to properly handle claims against their policies due to the threat of a bad faith action.

Accordingly, the Court finds that AIU did not act in bad faith, under the facts of this case, when it exhausted the policy limits in order to settle the claim against Sam's Club, leaving Shin Crest exposed to liability on the Blairs' claim. As a result, AIU is entitled to summary judgment on Shin Crest's bad faith claim.

## V. Conclusion

Accordingly, it is ORDERED AND ADJUDGED that Defendant's Motion for Summary Judgment (Doc. No. 72) is **GRANTED**. The Clerk is directed to enter judgment in favor of Defendant, to terminate all pending motions, and to close this case.

**DONE AND ORDERED** at Tampa, Florida, this 26th day of March, 2009.

SUSAN C. BUCKLEW
United States District Judge

Copies to:

Counsel of Record